* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Deluca and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Deluca, with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in the pre-trial agreement and at the hearing as:
 STIPULATIONS
1. The Employee/Employer relationship existed at all times relevant to this proceeding.
2. Allied Claims Administration was the carrier on the risk at all times relevant to this proceeding.
3. The parties were subject to the North Carolina Workers' Compensation Act at all times relevant to this proceeding, the employer employing the requisite number of employees to be bound under the provisions of said Act.
4. The plaintiff previously filed a claim (I.C. File No. 301495) for the occupational disease of bilateral carpal tunnel syndrome with an alleged onset date of April 8, 2002, per I.C. Form 18. The plaintiff never alleged in that claim that any other medical conditions were related to her work. The Deputy Commissioner and the Full Commission entered Opinions and Awards finding and concluding that the plaintiff did not suffer an occupational disease as a result of her work with the defendant-employer, and denying the plaintiff's claim in its entirety. As of the date of the hearing before the Deputy Commissioner, the plaintiff had filed a Notice of Appeal to the Court of Appeals on I.C. File No. 301495, but no final Record on Appeal had been filed by plaintiff, and no docket number had been assigned by the Court of Appeals.
5. The plaintiff's average weekly wage was determined to be $533.47, with a resulting compensation rate of $355.66 pursuant to a Form 22 prepared on February 7, 2003, in connection with I.C. File No. 301495.
 * * * * * * * * * * *
Based upon the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. The plaintiff was 42 years old on the date of the hearing, having a date of birth of July 27, 1962. She has a high school diploma and one year of college. The plaintiff is morbidly obese. She is five feet five inches tall and weighs approximately 289 pounds. She has been this weight since at least the early nineties.
2. The plaintiff started work with Rex Healthcare (hereafter referred to as "defendant-employer") in 1990 as a telephone representative who took customer service inquiries.
3. The plaintiff confirmed that her work as a customer service representative remained consistent the entire time she worked with the defendant-employer from 1990 to 2003. She dealt with patients the whole time. She admitted she liked her work and was good at it. Other than seeking promotions, the plaintiff never asked to transfer away from the job. She received good evaluations through 2001. The plaintiff stated her only real problem with the defendant-employer was with management, and that she would go back to her job as a customer service representative if she could, although not at the defendant-employer due to the past history with the defendant-employer.
4. The plaintiff testified her problems with the defendant-employer started in late 2000 and early 2001. The plaintiff first got upset after Darlene Smith was chosen Employee of the Month for December 2000 instead of her. The plaintiff became involved in an argument with Ms. Smith over the issue and was counseled for her behavior. Thereafter, the plaintiff stated her supervisor, Sonya Phillips, told everyone in the department that customer service representatives would be getting a pay increase from a Level 6 to a Level 7. The increase was never approved. The plaintiff testified that when she asked about the increase at a meeting in February 2001, her department manager Marc Pulczinski became irate and made a racial slur, stating she "looked" like Louis Armstrong.
5. The plaintiff then stated things got worse from there. She alleged that Kayla Moore told her not to ask about issues not on the agenda. She also stated Ms. Moore became upset with her about a meeting which was scheduled for March 2001 regarding attendance of another employee, and told her she could not address that issue. In both March and April 2001, the plaintiff was passed over for promotions she thought she deserved more than the people who received them. She filed an EEOC complaint, which resulted in more investigations, meetings, and litigation.
6. The plaintiff testified she perceived that there was a pattern of harassment designed to try to fire her, and that this "stressed" her. She was frustrated and upset after she was not chosen for an Analyst position. She then felt like Defendant-Employer was "watching" and "monitoring" her. She stated she was subject to desk audits and watched when she went to the restroom. The plaintiff thought people were following her around the office. In May 2001, the plaintiff testified another meeting was held between Kayla Moore, Marc Pulczinski, and herself in a team-building effort. She interpreted this as an effort to "intimidate" her and get her to stop making complaints.
7. In June 2001, the plaintiff involved herself in reporting a co-worker who had released the CEO's salary. In July 2001, the plaintiff filed an EEOC claim against the defendant-employer, and her lawyer sent letters to the defendant-employer demanding certain actions. The plaintiff stated that the monitoring became worse thereafter. She also thought her phones were being tapped. She alleged Defendant-Employer was "after me."
8. The plaintiff's employment discrimination lawyer's demands for changes at the defendant-employer continued into the Fall of 2001 and through the beginning of 2002. On February 22, 2002, the plaintiff's employment discrimination lawyer demanded that the defendant-employer remove three of the plaintiff's managers.
9. Shortly thereafter, on February 27, 2002, the plaintiff was hospitalized for congestive heart failure. The plaintiff received short-term disability through the defendant-employer while she was out for her congestive heart failure and her medical bills were paid by health insurance through the defendant-employer. On her leave of absence paperwork, the plaintiff denied that her problems were work-related. The plaintiff returned to work with the defendant-employer on April 8, 2002. The plaintiff confirmed she was not seeking any disability benefits after she returned to work. Her blood pressure stabilized. She continued working as a customer service representative until she was terminated for insubordination in February 2003.
10. The plaintiff previously brought a workers' compensation claim against the defendant-employer for carpal tunnel syndrome for injuries beginning in approximately April 2002. The Form 18 for that claim was filed December 30, 2002. The plaintiff never mentioned stress, hypertension, or congestive heart failure. She gave a recorded statement for that claim on October 23, 2002, and never mentioned them there either. When asked if she had any "unrelated" medical conditions, the plaintiff stated she was a heart patient. During a hearing for the carpal tunnel syndrome claim, the defendants' lawyer specifically asked the plaintiff about her heart problems, and the plaintiff did not claim they were work-related. She did not mention anything about heart problems or stress in her appeal to the Full Commission. This was despite the fact that her employment law attorney was claiming discrimination and harassment were causing her stress as early as February 2002. She alleged this in her employment law complaint. Her employment law case was dismissed under Rule 12(b)(6) on November 21, 2003. The plaintiff filed her Form 18 in this case on January 15, 2004. In her hearing testimony on March 22, 2005, the plaintiff explained the failure to raise her stress claim in the prior workers' compensation case by saying that she believed it had been proper to raise that claim in her employment discrimination litigation instead.
11. Paula Davis worked as a customer service representative with the plaintiff. She did not have any information to corroborate the plaintiff's claims of being followed or harassed. She explained that telephone monitoring was not unique to the plaintiff, and that management would hang up if it were a personal call. Ms. Davis testified that there were a lot of changes in the office in 2001, and that everyone was required to "step up" to make sure that calls were covered. However, she confirmed that was similar to what can happen at any other job where she had worked before the defendant-employer, and that no one else at the defendant-employer ever filed a workers' compensation claim or suffered any heart problems as a result of this. She also stated she never felt harassed or intimidated by management at the defendant-employer.
12. George Rizk, the plaintiff's husband, testified that the plaintiff was "very happy" before 2001. She had been working as a customer service representative for 11 years at the same job and had never made complaints about the requirements of her actual job causing her stress before the confrontations began in 2001. Mr. Rizk testified that after the confrontations began, Plaintiff began to experience sleep disturbances. Keralos Rizk, the plaintiff's son, corroborated his father's testimony that the plaintiff was happy in her job for over a decade before the confrontations began in 2001. He further testified that after the plaintiff's difficulties at work began, she stopped doing as much with the family, became tense, and would snap at family members.
13. Lisa Hodges, the Human Relations Coordinator for the defendant-employer, spoke with the plaintiff about her claims of discrimination and unfair treatment, and was involved in the investigation of them. She wrote a letter to the EEOC investigator asserting the lack of foundation for the plaintiff's claims of discrimination. The plaintiff never made any complaints to her about difficulties or stress from her job duties as a customer service representative. All of her complaints revolved around problems with management.
14. Kayla Moore began work with the defendant-employer in 1991. She worked with the plaintiff in the customer service department for many years. Ms. Moore became the plaintiff's manager in 2001. Ms. Moore confirmed that no one other than the plaintiff ever made a claim for heart problems or other injuries allegedly resulting from "stress" as a customer service representative. The plaintiff never complained to Ms. Moore about the duties of her job, never requested a transfer, appeared to handle her job duties in customer service exceptionally, and liked her job.
15. Ms. Moore explained that all of the plaintiff's problems involved difficulties dealing with management and feelings that she was being treated unfairly. These began in late 2000 and early 2001, and started with not being named Employee of the Month. Ms. Moore was subsequently involved in dealing with the complaints and grievances filed by the plaintiff. None of those complaints were found to have any validity and all revealed the plaintiff was the instigator of the incidents. Ms. Moore denied all of the plaintiff's claims that she had tapped the plaintiff's phones, monitored her computer, followed her, or attempted to intimidate her.
16. Ms. Moore filled out the plaintiff's Leave of Absence request for her heart problems. The plaintiff never told her that she felt her heart problems had been caused by work. She was not aware the plaintiff was making such a complaint until the plaintiff filed the Form 18 in this case.
17. The plaintiff was terminated in February 2003. Ms. Moore had asked to speak to the plaintiff about a work-related question that had arisen. The plaintiff refused to attend the meeting without a tape recorder. After the plaintiff was asked to put the tape recorder away and refused, Ms. Moore terminated her for insubordination.
18. Marc Pulczinski, the Director of the Customer Service Department at the defendant-employer, explained, and it is found as a fact, that the "Louis Armstrong" reference was directed at the plaintiff having a scratchy voice and sounding like the singer, and was not in any way related to appearance or race. He stated that the plaintiff had not been discriminated against. The people chosen over her all had more experience or were otherwise better qualified.
19. Mr. Pulczinski confirmed the plaintiff had never been watched, followed or intimidated. All phone monitoring or desk audits done on the plaintiff were done for quality assurance purposes and were no different from those done for all other employees. Mr. Pulczinski explained that all of the plaintiff's problems at work started in late 2000 and early 2001. These problems all revolved around conflicts and disagreements with decisions made by management. During all his meetings with the plaintiff, she never complained about workload or stress from her job duties. She never asked for a transfer from the Customer Service Department. He and all of the other managers made multiple efforts to counsel the plaintiff and resolve her perceived problems amicably.
20. Sonya Phillips is the patient financial service manager at the defendant-employer. She has been in that position since August 2000. She worked for the defendant-employer as a collections and customer service representative between 1991 and 2000. Ms. Phillips was a co-worker and manager with the plaintiff from 1991 to 2000. Ms. Phillips explained that the plaintiff was a very good employee with her customer service skills. However, she had "issues" with insecurities and dealing with her co-workers and management. Ms. Phillips testified that the plaintiff felt that co-workers or managers were "against her." She often got "defensive or felt uncomfortable in situations with co-workers and management." As an example, Ms. Phillips stated that the plaintiff would print all of the emails sent out throughout the department, especially from management. When asked why she did that, the plaintiff told her that it was "just in case she needed it later." There also was an instance where the plaintiff stated that there was general unhappiness in the department because Ms. Phillips would go to movies with co-workers and subordinates. However, when this was brought up to the department, it was discovered that the plaintiff was only speaking for herself and did not represent others as she had stated.
21. Ms. Phillips testified that during all the time she worked with the plaintiff either as a co-worker or supervisor, she never heard the plaintiff complain about the job duties of a customer service representative being too stressful. Ms. Phillips stated: "She never complained about the role. Quite the opposite. She always said she loved the role, that she like working with our customers and that she felt that was what she was meant to do." Moreover, Ms. Phillips never recalled the plaintiff ever having problems with patients or other callers to the customer service department. She never asked to be transferred out of the department.
22. Ms. Phillips testified the plaintiff took regular breaks and lunch. She never witnessed the plaintiff working through lunch because that was not permitted. She never heard the plaintiff complain about not getting enough breaks. While she confirmed that the plaintiff worked "some" overtime, she confirmed it was purely voluntary. Ms. Phillips testified that she was not aware of the plaintiff's phone ever being bugged, the plaintiff being followed, or management tracking the plaintiff's movements. The phone monitoring system was department wide. People were never watched or followed when they went to bathroom breaks. Ms. Phillips denied telling the plaintiff that a Level 7 salary increase had been approved for customer service representatives.
23. While Ms. Phillips testified that the job of a customer service representative could sometimes be stressful, it was no different from "how any job can be stressful." She was not aware of any other person in customer service as far back as 1991 ever developing hypertension or heart problems as a result of their work in customer service. Neither was she aware of any employee developing stress-related medical conditions from their work in the department. She was not aware of any formal complaints being made by any employees about the job being too stressful or stressful above the level of any other type of job.
24. Darlene Smith is an audit appeals specialist at the defendant-employer. She has worked in billing for approximately 15 years. She was a co-worker with the plaintiff from approximately 1995 forward. Ms. Smith confirmed that the plaintiff was very good at her job.
25. While Ms. Smith testified that some days work could be demanding and stressful, on other days it would not be stressful. Ms. Smith testified she had never been interrupted from her lunch in order to take calls due to high volume, and that she had never been approached to work through her break. Ms. Smith confirmed overtime was always voluntary. She also said that while the job of a customer service representative could be stressful some days and not stressful others, that was no different from any other job in life.
26. Ms. Smith confirmed that the plaintiff was not singled out or left out regarding any type of salary increase. Ms. Smith did recall Ms. Phillips telling her that a Level 7 salary increase had been approved, and it is found as a fact that Ms. Phillips made that statement to at least Ms. Smith and the plaintiff. Ms. Smith confirmed that the defendant-employer's right to monitor phone calls applied equally to all employees. She had no knowledge of anyone going behind her back and checking her work or monitoring her computer. She also had no knowledge of anyone monitoring the plaintiff's computer or following her.
27. Ms. Smith testified that the plaintiff appeared to like her job and that the only concerns about her actual job duties the plaintiff expressed to Ms. Smith revolved around feeling like management was singling her out. The plaintiff never told her that she ever wanted a transfer. In fact, she told Ms. Smith she wanted to be a supervisor in the department.
28. Ms. Smith was present in the meeting and heard Mr. Pulczinski comment about the plaintiff sounding like Louie Armstrong. She testified she didn't think anything about it. Ms. Smith testified that the plaintiff had a tendency to become "defensive." If the plaintiff perceived that something was not accurate, she would disagree and escalate the situation in pressing her position. Ms. Smith said this was particularly so between the plaintiff and management. While Ms. Smith said she got along fine with the plaintiff, she noticed that the plaintiff did not necessarily get along well with others. In explaining what she meant by the plaintiff being "defensive," she stated that the plaintiff was "very aggressive" in arguing back if she did not agree with someone.
29. Ms. Smith also testified that she had had experiences where the plaintiff had told her something that she found out later was not exactly as it had occurred. This included the plaintiff leaving facts out or embellishing the truth. Ms. Smith testified there were times in which the plaintiff misinterpreted or misrepresented things that had gone on in the office. Ms. Smith stated that the plaintiff generally perceived that she was being victimized in some way.
30. Dr. Stephen Moore is a board certified family doctor. The plaintiff was seen in Dr. Moore's practice beginning in February 2002. Dr. Moore treated the plaintiff for her heart from 2002 until 2004. Dr. Moore noted that on September 12, 2002, the plaintiff complained of job stress. However, she explained to Dr. Moore that it was related to "litigation with her company."
31. Dr. Moore wrote a letter on December 5, 2003, stating that job stress, along with plaintiff's hypertension, obesity, family history of hypertension, and race contributed to her congestive heart failure. In response to hypothetical questions from the plaintiff's attorney, Dr. Moore expressed the opinion that the plaintiff's congestive heart failure was caused by her hypertension. He then stated that a number of different things contributed to her hypertension including her family history, race, obesity, and stress. On cross-examination, Dr. Moore confirmed that there are "many" known causes and factors for developing hypertension. These include obesity, family history, race, as well as a number of other causes. Dr. Moore did not mention "stress." Dr. Moore testified that the plaintiff was "very" obese at the time he saw her. She weighed approximately 286 pounds, which is approximately double her optimal weight for her age and height. Dr. Moore confirmed that the longer a person remains obese the greater the risk for these conditions increases. Dr. Moore then testified that the plaintiff's obesity alone could be the cause of her hypertension and resulting congestive heart failure. He noted that the plaintiff had hypertension when she was not at work and just coming into the office, and she had hypertension when she quit the defendant-employer and was not at work, but most significantly, "when she dropped weight, her blood pressure went down." Ultimately Dr. Moore was unwilling to express an opinion that the plaintiff's obesity was the primary cause of her hypertension or retract his opinion that stress was a contributing factor to her hypertension.
32. Dr. Moore confirmed there were no reports in his records of the plaintiff complaining about the technical job duties of a customer service representative being too stressful. Dr. Moore testified he did not remember the plaintiff ever mentioning the duties of her job, such as too many calls or unusual volume of calls, as being the source of her stress. He confirmed that the "stress" that he was referring to in his letter of December 5, 2003, was related to her "conflict" at work. His specific recollection was that her stress was related to conflicts and litigation not the duties of a customer service representative.
33. Dr. Moore testified that the plaintiff's congestive heart failure was stabilized from the first time he saw her. Her blood pressure was stabilized by approximately May or June 2002. Furthermore, considering that the plaintiff was no longer working for the defendant-employer after March 2003, he did not feel that her work with the defendant-employer would have any more relationship with her ongoing congestive heart failure, cardiac problems, or hypertension. Dr. Moore affirmed that no treatment after the time the plaintiff left work with the defendant-employer in March 2003 would be in any way related to any stress from conflicts at work at the defendant-employer.
34. Dr. Paul Burton Harden, Jr., is board-certified in obstetrics and gynecology. Dr. Harden has been the plaintiff's OB-GYN from 1985 to the present. Dr. Harden testified that the plaintiff did not have problems with hypertension during her normal yearly visits with him. He did note, however, that her blood pressure routinely went up at the end of each of her pregnancies.
35. Dr. Harden wrote a letter at the request of the plaintiff indicating that he had not ever treated her for hypertension or documented the same during office visits. He later wrote her a letter stating, "possibly" the stress that she had felt under may have contributed to both her blood pressure and subsequently congestive heart failure; "But I couldn't — did not feel that I could in any way say how much or to what degree. . . ." On cross-examination, Dr. Harden made clear that he was only saying it was "possible" that problems at work could be a factor in her heart conditions, but he could not say to a reasonable degree of medical certainty that it was more likely than not a factor. He could not say it was a "significant or substantial contributing factor." Dr. Harden deferred to the doctors who treated the plaintiff for her hypertension or congestive heart failure regarding the question of causation.
36. Regarding Dr. Harden's testimony that the stress at work "could" have been a factor in the plaintiff's hypertension and congestive heart failure, Dr. Harden made clear that it was his understanding the "stress" she was referring to revolved around conflicts with supervisors, not her normal job duties as a customer service representative.
37. Dr. Gary Owen Bean is a board-certified family physician. The plaintiff began treating in Dr. Bean's practice in September 1999. Dr. Bean treated the plaintiff actively as her family physician from September 1999 through approximately January 29, 2001, and then saw her one last time in December 2003.
38. Dr. Bean testified that the plaintiff's blood pressure was in the high-normal range during the time he treated her. He made clear that the focus of his treatment in this respect was getting her to lose weight in an effort to control her blood pressure without medication. Dr. Bean testified that the plaintiff was morbidly obese. Dr. Bean stated that, "diabetes and hypertension are the two major factors that are associated with that level of weight." When asked what some of the causes were for congestive heart failure, Dr. Bean stated, "hypertension, diabetes, obesity, hyperlipidemia" and a number of other factors. He did not mention stress.
39. When asked a hypothetical question by the plaintiff's attorney about whether stress from work "could" have caused an increase in the plaintiff's blood pressure, Dr. Bean stated that it "could," but that the plaintiff's biggest risk was her obesity. When asked whether he could say to a reasonable degree of medical certainty that there was a causal relationship between stress at work and the plaintiff's heart problems, Dr. Bean stated, "It would be very, very difficult for me to give you any kind of reasonable answer," and he deferred to Dr. Moore for his assessment.
40. On cross-examination, Dr. Bean confirmed that during all the times he saw the plaintiff, she never mentioned any stress or problems with her job as a customer service representative to him. She never requested any treatment or medication for anxiety or depression, and she never asked for any referral to a psychiatrist or counselor due to stress. Dr. Bean testified that, in his opinion, the most likely cause of the plaintiff's borderline hypertension during the time he treated her was, "her weight." From review of his records and from his treatment of the plaintiff, stress from work was never the cause of any of borderline hypertension during the time he saw her.
41. Having reviewed all of the evidence of the record, the Full Commission finds that the plaintiff has failed to establish that her work as a customer service representative placed her at an increased risk of developing her heart conditions, including but not limited to hypertension and congestive heart failure.
42. The Full Commission finds that the plaintiff has failed to establish that her heart conditions, including but not limited to hypertension and congestive heart failure, were either caused by or substantially aggravated by her work as a customer service representative for the defendant-employer. The evidence of record establishes that the plaintiff's heart conditions are more likely than not due to her obesity and associated unrelated medical conditions.
43. To the extent that the plaintiff suffered any "stress" during her employment with the defendant-employer, the greater weight of the evidence establishes that this was due to conflicts with co-workers and management, her recognized tendency to misinterpret and overreact to situations, and her claims of discrimination and resulting litigation, and not her job duties as a customer service representative.
44. The Full Commission finds that, although the plaintiff's claim was unsuccessful, the claim was not "brought, prosecuted, or defended without reasonable ground. . . ." N.C. Gen. Stat. §97-88.1. Thus, the Full Commission finds that the defendants' request for attorney fees and costs pursuant to N.C. Gen. Stat. §97-88.1 is unwarranted.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The plaintiff did not suffer a compensable injury by accident or occupational disease arising out of or occurring in the course of her employment with the defendant-employer. N.C. Gen. Stat. §§ 97-2(6), 97-53(13); Woody v. ThomasvilleFurniture, 355 N.C. 483, 562 S.E.2d 422 (2002); Rutledge v.Tultex Kings Yarn, 308 N.C. 85, 301 S.E.2d 359 (1983).
2. The plaintiff's claim is not barred by res judicata.
3. The defendants are not entitled to attorney fees and costs pursuant to N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. The plaintiff's claim for medical and disability benefits resulting from her heart conditions, including but not limited to hypertension and congestive heart failure, are hereby DENIED.
2. Each side shall bear its own costs; however, the defendants shall pay the expert witness fee for Dr. Harden in the amount of $400.00, if not already paid by prior Order of the Commission.
This 23rd day of June 2006.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER